UNITED STATES of America, Plaintiff,

v.

Genaro Felix GASTELLUM, Defendant.

No. 95–CR–393–D.

United States District Court,
D. Colorado.

May 24, 1996.

Daniel J. Cassidy, Assistant United States Attorney, Rocky Mountain Drug Task Force, Denver, CO, for U.S.

Michael G. Katz, Federal Public Defender's Office, Denver, CO, for Defendant.

## MEMORANDUM OPINION & ORDER

DANIEL, District Judge.

### I. INTRODUCTION

This matter is before the Court on defendant's Motion to Suppress Evidence, filed December 13, 1995, wherein he argues that evidence seized as a result of a traffic stop must be suppressed. The matter has been fully briefed and a full evidentiary hearing

occurred on May 2, 1996. As discussed below, I GRANT the defendant's motion.

## II. *FACTS*

On October 27, 1995, defendant was driving a 1987 Pontiac sedan with Nebraska license plates on Colorado Highway 160—a paved two-lane 55 m.p.h. road—approximately one to two miles west of the town of Monte Vista, Colorado. The area is part of the San Luis Valley, which is mountainous and rolling hill terrain. At approximately 7:44 a.m., the defendant, an Hispanic male, was pulled over by a marked Colorado State Trooper vehicle driven by Trooper Cox and his partner that day, Trooper Crowther. The defendant was travelling east on Highway 160 towards Monte Vista in a cluster of approximately six cars. It was just after day break, the weather conditions were clear, and the road was dry.

Recapping the relevant events, Trooper Cox was travelling in the opposite direction on Highway 160 and decided to make a U-turn to follow the cluster of vehicles as part of his normal patrol duties. Of significance, Trooper Cox stated that he was not attempting a U-turn for the specific purpose of following the defendant or any other specific vehicle, but rather simply as part of his normal patrol duties, though he did notice that one of the vehicles in the cluster had Nebraska license plates. Also, both officers testified at the hearing, and I accept as true, that they were unaware that defendant's vehicle was being driven by an Hispanic male when it passed them. Once the cluster of cars passed and the road was clear, Trooper Cox pulled out and began heading in the direction the defendant was travelling.

Within moments of turning around, the troopers saw the defendant's vehicle weave once, approximately one to three feet over the right-hand shoulder solid white line ("shoulder stripe"), at which time Trooper Cox immediately activated his emergency lights to pull the defendant over. On cross-examination, Trooper Cox stated that this

weaving incident took place on a curved section of the road. Of significance, the defendant's vehicle crossed the shoulder stripe only momentarily, perhaps for less than a second, at which time it returned to its lane. Both officers also testified that while closing the gap on defendant's vehicle after observing it weave, there was not anything else suspicious about the vehicle and it did not have defective equipment.

Once the defendant had pulled over in routine fashion, the uniformed officers approached. As is customary, Trooper Cox asked for the defendant's license and registration. The defendant produced an Arizona driver's license which identified him as Felix Gastelum as well as an expired Nebraska driver's license with the same name and picture. He also produced a Nebraska vehicle registration which indicated that the vehicle was registered to someone other than the defendant. While Trooper Cox was holding the documents, he asked the defendant who the owner of the vehicle was. The defendant stated "Jesus Hernandez," which matched the information on the registration. Then Trooper Cox asked the defendant for the telephone number and address of Jesus Hernandez, which the defendant was unable to provide. Trooper Cox then asked the defendant where he was coming from and going to. The defendant stated that he was returning to Nebraska, where he had been laid off from work three months prior, after searching for work in Arizona.

During this course of events, Trooper Cox informed the defendant that he had been pulled over for weaving and asked if he had been drinking or whether he was tired or sleepy.[1] The defendant answered "no" to these queries, and Trooper Cox informed the defendant that he would only receive a verbal warning rather than a ticket. Both officers also testified that while this routine exchange was taking place, the defendant was uncharacteristically nervous (i.e. shaking, having trouble getting license out of wallet, etc.). Finally, Trooper Cox testified that during

---

1. Though the officers stated that they were concerned that the defendant was perhaps impaired or fatigued, I note that they did not perform a sobriety test or even ask the defendant to walk around.

this sequence of events he had noticed that a panel on the right side door appeared to have been tampered with.

Next, the troopers returned to their car to run a computer check on defendant's documents. Nothing unusual was uncovered in that the defendant was not wanted and the vehicle was in fact registered to Hernandez of Grand Island, Nebraska. Together, the troopers then reapproached the defendant's vehicle with the hope, or perhaps the intention, of conducting a consensual search since they suspected the defendant and his vehicle were involved in criminal activity. Upon re-approaching defendant's vehicle, Trooper Cox handed back the documents to the defendant, and then advised the defendant that he "was free to go" and to drive carefully. Then, after a brief hesitation lasting no more than a second or two, Trooper Cox said to the defendant, "Before you go, do you have any weapons in the vehicle." The defendant responded that he did not have any weapons. Trooper Cox then asked if he had any drugs, and the defendant then dropped his head, looked away, and responded that he did not have any drugs. Then, with little or no hesitation, Trooper Cox asked the defendant if he would mind if Trooper Cox "looked through his vehicle for weapons or drugs," to which the defendant responded, "Yeah, sure," or words to that effect.

The ensuing search, which lasted at least 30 minutes, resulted in Trooper Cox discovering packets of methamphetamine hidden in a secret compartment in the car's center console. In order to find the controlled substance, Trooper Cox searched the panels of the trunk and the spare tire area, removed interior panels that had been fastened with screws, removed covers from bolts, checked the carpet for cuts, pulled the carpet up, and removed the two bucket seats from the car and placed them on the side of the highway. In effect, Trooper Cox, who had experience identifying non-factory parts as well as the tampering of vehicles, disassembled the car. Trooper Cox then read the defendant his rights in English at the scene, which the defendant indicated he understood.[2] After arriving at police headquarters, Trooper Cox had Trooper Martinez—a Spanish speaking officer—advise the defendant of his rights in Spanish as well.

As a result of the foregoing, defendant was charged with knowingly possessing with the intent to distribute 100 grams or more of methamphetamine, a Schedule II controlled substance. 21 U.S.C. § 841(a)(1), (b)(1)(C) & 18 U.S.C. § 2. Defendant now moves to have the evidence and all statements made related thereto suppressed. He claims that the entire encounter from the initial stop to the resultant search violated his fourth amendment rights of protection from unreasonable searches and seizures. I agree and hold that the evidence must be suppressed.

## III. DISCUSSION

■ Since, as the Tenth Circuit recently stated, "[a] vehicle stop is usually a limited seizure ... and 'is more like an investigative detention than a custodial arrest,' [I must] analyze the stop and detention of [defendant's] vehicle under the principles of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." *United States v. Orrego–Fernandez,* 78 F.3d 1497, 1503 (10th Cir.1996) (citation omitted). Since *Terry* stop encounters are reviewed "in a step-by-step manner," I analyze the relevant events that transpired in piecemeal fashion. *United States v. Lee,* 73 F.3d 1034, 1038 (10th Cir.1996) ("We

---

**2.** Though the defendant expends considerable energy in his briefs arguing that he had little, if any, facility with the English language, I note that all the testimony received at hearing indicates that he understood English. To this effect, I note that all three officers who testified—Crowther, Cox, and Martinez—stated that the defendant understood English, though it was also apparent that Spanish was his first language. Since the defendant did not testify at the hearing, the evidence is uncontroverted that he understood English. I also note, however, that at the hearing the defendant employed the services of an interpreter. Nonetheless, based on the uncontroverted testimony, I find that the defendant understood English and any language barrier has no bearing on the issues now before me.

review *Terry* stop encounters in a step-by-step manner because what may begin as a routine stop will often escalate into probable cause for a search or a search pursuant to a consensual encounter."). Thus, I must "examine each stage of the encounter to ensure that the government had the required amount of reasonable suspicion, probable cause, or consent to support the search." *Id.* With this framework in mind, I note that there are four relevant events, which listed in chronological order are: (1) the initial stop; (2) the subsequent detention and questioning; (3) the search; and (4) the arrest and recitation of *Miranda* warnings. Because it is dispositive of my ruling, I commence my analysis with the search.

### A. *The Search*

■ As noted above, after the initial stop, Trooper Cox, within seconds of returning the defendant's license and registration, asked the defendant, "Before you go, do you have any weapons in the vehicle?" After the defendant responded "no," Trooper Cox followed up by asking whether he had any drugs in the vehicle, to which the defendant again responded "no" after looking away. Then, after a pause of no more than a second or two, Trooper Cox asked the defendant if he could "look" through his vehicle for drugs or weapons. The defendant responded affirmatively, was asked to exit the car, and was patted down. While Trooper Crowther stood over the defendant, as is standard practice, Trooper Cox commenced his search which lasted between 30 and 45 minutes and consisted of disassembling the vehicle before the controlled substance was found.

■ "The voluntariness of consent must be determined from the totality of the circumstances, and the government bears the burden of proof on the issue." *United States v. Soto,* 988 F.2d 1548, 1557 (10th Cir.1993). In making this determination, I do not presume that the consent was either voluntary or involuntary. *United States v. Price,* 925 F.2d 1268, 1271 (10th Cir.1991). To sustain its burden, "the government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." *Soto,* 988 F.2d at 1557 (citing *Price,* 925 F.2d at 1270).

In this instance, I find that the defendant's purported consent was not sufficiently voluntary for several reasons. First, the question that immediately preceded the request to search was coercive. Specifically, by using the words—*"Before you go,* do you have any weapons in the vehicle"—the inference is that the defendant was not in fact free to leave. By definition one is not free to leave if "before he goes" he is first required to answer some questions. Since the request to search immediately followed this question, it was quite reasonable for the defendant to assume that the request came with the same implicit modifier (i.e. "Before you go, do you mind if I look in your vehicle...."). If such was the case, then the purported "request" to search was not a request but rather a condition that the defendant was required to satisfy before he was in fact free to leave. In short, under these circumstances and given the language employed by the officer, the "request" was both confusing and coercive. The government's position is not saved by dissecting the encounter word-by-word in an attempt to show that the request was technically sound. As the directive of the Tenth Circuit states, I look at the "totality of the circumstances," not the semantical or technical meaning of each word employed.

Second, I look to factors such as: (1) was the defendant informed that he was free to leave; (2) was he informed that he could refuse consent; and (3) how many officers were present when the request was made. *Orrego–Fernandez,* 78 F.3d at 1505. These are "important factors in [my] consideration." *Id.* (quoting *United States v. McSwain,* 29 F.3d 558, 563 (10th Cir.1994)). In this instance, when Trooper Cox reapproached the defendant's vehicle, he began by stating that the defendant was "free to go." However, as discussed above, these words were undermined, if not retracted, by Trooper Cox's following statement, "Before you go...." Thus, I place little if any weight on the government's contention that the defendant was informed that he was "free to go." As for the other two listed factors, the defendant was not informed that he could refuse consent, and the request for consent was made with two uniformed officers present at the defendant's windowside. These circumstances reinforce my finding that the pur-

ported consent was involuntary in this instance.

■ Moreover, even assuming, *arguendo*, that the defendant did voluntarily consent, the search exceeded the consent given. The standard for measuring the scope of the defendant's consent is "what ... the typical reasonable person [would] have understood by the exchange between the [trooper] and the suspect." *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991). Here, Trooper Cox's search of the vehicle exceeded the scope of any consent that may have been given.

In making this finding, I emphasize that Trooper Cox asked the defendant if he could "look"—not "search"—through the defendant's vehicle for drugs and weapons. He then proceeded to "look" through the vehicle for at least 30 minutes during which time he searched the panels of the trunk, inspected the spare tire area, removed interior panels that had been fastened with screws, removed covers from bolts, checked the carpet for cuts, pulled the carpet up, and removed the two bucket seats from the car and placed them on the side of the highway. All of this occurred before the controlled substance was discovered in the hidden compartment under the center console. However defined, Trooper Cox did more than "look" through the defendant's vehicle. *See Orrego–Fernandez*, 78 F.3d at 1505–06 (affirming consensual search after noting that the trooper "did not search any hidden compartments in the cab or under the bed of the truck").

Based on these factors, I find that the search was not consensual. I further find that even assuming, *arguendo*, that the search was consensual, the search exceeded its permissible scope. Accordingly, the evidence obtained as a result of the illegal search must be suppressed.

## B. *The Initial Stop*

■ As explained below, recent Tenth Circuit authority is conflicting as to whether the initial stop—under the facts presented here—was lawful. Though admittedly *dicta* since my holding regarding consent is dispositive, here are my observations and conclusions regarding the lawfulness of the initial stop.

In overruling its prior case law, the Tenth Circuit succinctly and emphatically recently stated that

a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring. It is irrelevant, for purposes of Fourth Amendment review, "whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop." It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle. Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated "any one of the multitude of applicable traffic and equipment regulations" of the jurisdiction.

*United States v. Botero–Ospina*, 71 F.3d 783, 787 (10th Cir.1995) (*en banc*) (internal citations omitted). Accordingly, my inquiry regarding whether Trooper Cox's initial stop was legal would appear surprisingly simple. That is, it would seem as if I need only determine whether the defendant committed a traffic violation. To this effect, under *Botero–Ospina* it is apparent that the defendant's attempt to show that Trooper Cox's stop was pretextual and that the trooper has a history of pulling Hispanic males over under suspiciously like circumstances (i.e. weaving) is "irrelevant," in the words of the Tenth Circuit. *Id.*

In this instance, it is undisputed that the defendant did weave—however momentarily—which presumably is a violation of Colorado state motor vehicle law.[3] In *Botero–*

---

3. Colo.Rev.Stat. § 42–4–1007(1)(a) provides:
   **Driving on roadways laned for traffic.** (1) Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules in addition to all others consistent with this section shall apply:

   (a) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

*Ospina,* the defendant's "vehicle was travelling well below the posted speed limit and straddling the [center] lane as it traveled eastbound on Interstate 70." *Id.* at 788. This was a violation of the Utah Motor Vehicle Code relating to lane straddling (a/k/a "weaving").[4] *Id.* As is the case here, in *Botero–Ospina* the officer also stated that he was concerned that the driver may have been driving under the influence of drugs or alcohol or that perhaps the driver was fatigued. *Id.* at 785. Thus, pursuant to *Botero–Ospina,* it would appear that Trooper Cox's initial stop of the defendant was legal.

However, in *United States v. Gregory,* 79 F.3d 973 (10th Cir.1996), a case decided less than four months after *Botero–Ospina,* the Court held that a "single occurrence of moving to the right shoulder of the roadway ... could not constitute a violation of Utah law and therefore does not warrant the invasion of Fourth Amendment protection." *Id.* at 978. Of significance, and as demonstrated below, the facts of *Gregory* are analogous, if not identical, to those presented here. Specifically, the *Gregory* court described the facts as follows:

> On July 21, 1993, at approximately 6:00 p.m., Officer Phil Barney of the Servier County Sheriff's Office was patrolling Interstate 70 between Salina and Green River, Utah. At this location, the terrain is mountainous and high desert. The roadway is winding. The weather conditions on the date were clear and windy. While in pursuit of a van going seven miles over the speed limit, Officer Barney passed a U-haul rental truck headed in the same direction which was being driven by the defendant, a black male. As the officer passed, he looked in his rear view mirror and saw defendant's U-haul truck cross two feet into the right shoulder emergency lane of the interstate. The incident was a single occurrence. The emergency lane measures approximately fourteen feet wide. The officer testified that crossing

into the emergency lane of a roadway is a violation of Utah law. The officer testified that such conduct could also be indicative of a sleepy or intoxicated driver. The officer said he decided to stop the vehicle because of the traffic violation and to see if the driver was awake but that he did not intend to conduct a DUI investigation. The officer immediately abandoned his pursuit of the speeding van, pulled over and waited for the U-haul truck to pass, then pulled out and pursued defendant's vehicle. Officer Barney turned on his overhead lights which activated a video camera. He did not indicate that he observed any further driving irregularities as he pursued and pulled over the driver of the U-haul truck.

> . . . .

> After initially obtaining defendant's driver's license, Officer Barney did nothing to determine whether the defendant was impaired, except to ask the defendant if he was "awake." ... On cross examination the officer admitted that there was no indication that the defendant was impaired from alcohol, and he appeared alert. The officer also admitted observing that the defendant was holding a cup, which he assumed contained coffee, and responded, "Good enough." The defendant was not cited for a traffic violation and no road sobriety test was conducted by the officer.

> . . . .

> Officer Barney testified that he became suspicious that the defendant was hauling something illegal. The officer testified that he arrived at this conclusion because every time he asked the defendant a question, the defendant "would swallow before he answered." ... Based on these concerns, Officer Barney testified that he asked the defendant if he was carrying any illegal substances in the truck. The defendant said no. The officer asked if he could take a look in the truck. The defendant

---

**4.** I note that the relevant Utah statute relating to weaving is substantively identical to the Colorado statute at issue here. The analogous Utah provision provides:

> On a roadway divided into two or more clearly marked lanes for traffic the following provisions apply: (1) A vehicle shall be operated as

nearly as practical entirely within a single lane and may not be moved from the lane until the operator has determined the movement can be made safely.

Utah Code Ann. § 41–6–61(1) (1988) (*compare* with Colo.Rev.Stat. § 42–4–1007(1)(a), note 3, *supra* ).

indicated that he could and got out of his truck....

*Id.* at 975–76.

These facts are strikingly similar to those now presented. Specifically, in both cases, (1) the drivers were pulled over for a single instance of weaving, (2) they weaved momentarily for approximately two feet over the right shoulder emergency lane, (3) the area was mountainous and the roadway winding, (4) the Utah and Colorado weaving statutes are virtually identical, (5) the officers testified that in addition to weaving they were concerned that the driver may be sleepy or intoxicated, though they did not perform any tests, (6) upon observing the weaving, the officers immediately pulled the drivers over rather than follow for a short time, (7) the drivers were not cited for any traffic violation, (8) based on the drivers' body language, the officers became suspicious, (9) the officers asked if the drivers were carrying any illegal substances to which the drivers responded no, (10) the officers asked if they could take a "look" in the driver's vehicles to which the drivers responded yes, and (11) drugs were found as a result of the search.

Under these facts, the *Gregory* court held that "an isolated incident of a vehicle crossing into the emergency lane of a roadway is [not] a violation of Utah law." *Id.* at 978. As the court stated:

We agree with the Utah court which noted that the statute requires only that the vehicle remain entirely in a single lane "as nearly as practical." The road was winding, the terrain mountainous and the weather condition was windy. Under these conditions any vehicle could be subject to an isolated incident of moving into the right shoulder of the roadway, without giving rise to a suspicion of criminal activity.... Since the movement of the vehicle occurred toward the right shoulder, other traffic was in no danger of collision. These facts lead us to conclude that the single occurrence of moving to the right shoulder of the roadway ... could not constitute a violation of Utah law and therefore does not warrant the invasion of Fourth Amendment protection.

*Id.* Accordingly, the *Gregory* court held that the officer's initial stop was illegal and thus suppressed the evidence pursuant to the "fruit of the poisonous tree" doctrine. *Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963).

I also note that the *Gregory* court considered, and dismissed, "[t]he alternative premise relied upon ... to justify the stop of defendant's vehicle ... that the defendant was impaired by alcohol or lack of sleep." *Gregory,* 79 F.3d at 978. As the *Gregory* court explained in distinguishing *Botero-Ospina,*

In *Botero-Ospina,* we decided that straddling the center lane marker of an interstate could constitute an adequate basis to investigate for impairment of the driver due to sleepiness or intoxication. Driving under the influence of alcohol is a violation of Utah law. However, Officer Barney testified that he did not intend to stop the defendant to conduct a DUI investigation and in fact, he did not administer a road sobriety test after stopping the defendant. Thus, prior to stopping the vehicle, Officer Barney must have been satisfied that the vehicle's isolated movement into the right shoulder did not give rise to a reasonable suspicion that the driver was intoxicated.

Officer Barney testified that over 80 percent of the serious vehicle accidents in this area were caused by drivers who fell asleep at the wheel.... However, driving while fatigued is not a criminal activity and only if a driver is extremely fatigued can the danger constitute a danger to public safety. Officer Barney did not testify to any factors which would support a reasonable suspicion that the defendant's driving constituted a threat to injury to himself or others.... There is no testimony that Officer Barney saw the defendant nod his head or show any signs of sleepiness. As we have stated, "[I]f failing to follow a perfect vector down the highway or keeping one's eyes on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy." We take issue with the district court's conclusion that Officer Barney's initial stop of defendant's vehicle was based on a reasonable suspicion that the defendant had violated a traffic or equipment regulation sufficient to

justify the stop. We do not believe that Officer Barney had sufficient grounds to stop the defendant's vehicle.

*Id.* at 978–79.

Essentially, *Gregory* is distinguished from *Botero–Ospina* on the fact specific and somewhat mercurial distinctions that (1) the weaving was directed at the shoulder rather than the center lane, and (2) the terrain was winding and mountainous. I also note that *Botero–Ospina* and *Gregory* appear to be contradictory. Specifically, though both decisions are predicated on the Utah weaving statute which makes no distinction between weaving over the center lane versus weaving over the shoulder, the decisions seem to reach different results based on this distinction. Nonetheless, since the facts presented here are more akin to those of *Gregory* and since the Utah weaving statute and Colorado weaving statute are substantively identical, I find that the initial stop of defendant's vehicle was illegal in this instance.

Before concluding, I note that the *Gregory* court cited *Utah v. Bello,* 871 P.2d 584, 586 (Utah App.1994), in support of its conclusion that "an isolated incident of a vehicle crossing into the emergency lane of a roadway is [not] a violation of Utah law."[5] *Gregory,* 79 F.3d at 978. However, neither I nor the parties could find any Colorado state authority addressing the narrow question of whether a single instance of weaving over the shoulder constitutes a violation of Colo.Rev. Stat. § 42–4–1007(a). Though the government cites *Colorado v. Rodriguez,* No. 94CA0076, at *4, —— P.2d ——, —— [1996 WL 48875] (Colo.App. Feb. 8, 1996), this case does not address this narrow issue. Instead, the *Rodriguez* court stated:

> Here, the trial court found, and we agree, that the trooper had reasonable, articulable suspicion that defendant had been driving while intoxicated. Given the totality of the circumstances, it was reasonable for the trooper to believe that the driver of a van that weaved, even once, was intoxicated. Hence, the initial stop was not constitutionally defective.

*Id.* Furthermore, though the *Gregory* court seemed to cite Utah case law as additional support for its holding, it did not seem to suggest that the Utah court's interpretation was controlling in the federal context. In any event, absent controlling authority on the narrow issue of whether weaving once under the circumstances presented here constitutes a violation of Colo.Rev.Stat. 42–4–1007(a), *Gregory* controls my analysis. Thus, in this instance, based on *Gregory* I conclude that the initial stop was illegal as well.

### C. *Defendant's Statements Made While in Custody*

In a separately styled Motion to Suppress Statements, defendant also argues that any statements made by him while in custody should be suppressed. This motion is based on two independent theories: (1) based on the fruit of the poisonous tree doctrine, if either the initial stop, subsequent questioning, or vehicle search was unconstitutional, then naturally any statements garnered afterward are similarly unconstitutional; and (2) the trooper failed to give defendant his *Miranda* warnings until he arrived at the station. Since here the search was illegal, the first ground—fruit of the poisonous tree—is dispositive and I need not consider the second ground relating to the timing of *Miranda* warnings. Accordingly, the search having been illegal, any statements made by defendant thereafter must be suppressed.

### IV. *CONCLUSION*

For the reasons discussed above, defendant's Motion to Suppress Evidence and defendant's Motion to Suppress Statements are GRANTED.

---

**5.** Remarkably, I note that *Botero–Ospina, Gregory,* and *Bello*—as well as *Lee,* 73 F.3d at 1034, which I cited earlier—all involve the same Utah Trooper who pulled vehicles over for weaving.