**UNITED STATES of America,**
**Plaintiff,**

v.

**Alberto MAGALLANES, Defendant.**

No. 8:10CR107.

United States District Court,
D. Nebraska.

Aug. 3, 2010.

Robert C. Sigler, U.S. Attorney's Office, Omaha, NE, for Plaintiff.

## MEMORANDUM AND ORDER

JOSEPH F. BATAILLON, Chief Judge.

This matter is before the court on the government's objection, Filing No. 36, to the findings and recommendation ("F & R") of the magistrate judge, Filing No. 35, concerning the defendant's motion to suppress evidence obtained as a result of a traffic stop and subsequent search that occurred on November 30, 2009. Filing No. 25. The indictment charges defendant with two counts under 21 U.S.C. § 841(a)(1), (b)(1) for intentionally possessing with the intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of a Schedule II controlled substance: (1) methamphet-

**972**

amine, its salts, isomers, or salts of its isomers; and (2) cocaine. Filing No. 1.

Under 28 U.S.C. § 636(b)(1), the court makes a de novo determination of those portions of the F & R to which the parties object. *United States v. Lothridge*, 324 F.3d 599, 600–01 (8th Cir.2003). The court has conducted a de novo review of the record and exhibits, including the transcript of the suppression hearing. Filing No. 34, Transcript ("Tr."); Filing No. 31, List of Hearing Exhibits ("Ex.") 1, 101, 102. The court agrees with the magistrate judge's recitation of the facts, and concurs with the magistrate judge's recitation of the law. The court finds the government's objections to the F & R should be overruled and the defendant's motion to suppress granted as to evidence obtained as a result of the traffic stop.

## FACTS

At approximately 10:30 p.m. on November 30, 2009, while patrolling Interstate 80 around Harrison Street, Deputy Peterson, a deputy with the Douglas County Sheriff's Office K–9 interdiction unit, "observed [a vehicle] heading eastbound with Arizona plates" driving at the speed limit. Tr. 5:18–21, 6:17–24, 7:7–13, 26:10–12. Deputy Peterson decided to follow the defendant's vehicle because the vehicle had out-of-state license plates. Tr. 26:3–6. Deputy Peterson testified that "[o]ut-of-state plates is what we typically will stop." Tr. 25:24. As he followed the vehicle, Deputy Peterson saw the vehicle commit two alleged traffic violations. These alleged traffic violations consisted of "[d]riving on the shoulder at two separate locations." Tr.

7:12–15. As Deputy Peterson described it, he witnessed the vehicle drive onto the shoulder of the interstate for approximately 100 feet at two separate locations. Tr. 7:15, 28:10–13, 44:1. Those two locations were (1) somewhere between I Street and L Street, and (2) at the Interstate 680/80 junction. Tr. 7:17–20, 27:19–20. Each time, the defendant's vehicle was on the shoulder for approximately one second and the width of the right side passenger tires crossed onto the shoulder. Tr. 28:19–21, 38:10–12, 44:2–4. Deputy Peterson testified that he had the ability to record these alleged traffic violations on video using a camera in his cruiser, but did not do so. Tr. 27:2–17, 30:15–20.

Deputy Peterson followed the defendant's vehicle for about a mile and a half before he activated his lights and pulled over the defendant's vehicle. Tr. 11:8–10, 30:21–22. Between the time Deputy Peterson saw the defendant's vehicle cross onto the shoulder at the Interstate 680/80 junction and the time Deputy Peterson actually activated his light, the defendant "followed every traffic law requirement." Tr. 31:19–25, 32:3–6. Deputy Peterson gave two responses as to why he stopped the defendant's vehicle. On direct examination, Deputy Peterson testified that the only reason he stopped the defendant was because the defendant violated a traffic law by driving on the shoulder. Tr. 17:2–5.[1] On cross-examination, by the defendant's attorney, Deputy Peterson testified that he stopped the defendant for both the traffic violation and for the possibility that the defendant was an impaired driver. Tr. 38:13–18.[2]

---

**1.** The prosecution asked Deputy Peterson on direct, "did you have reasons for stopping him other than just the traffic violation?" Tr. 17:3–4. Deputy Peterson responded, "That was the only reason, just for the traffic violation." Tr. 17:5. Deputy Peterson also testified that he believed any time a vehicle

crosses the shoulder line constitutes a traffic violation under Nebraska law. Tr. 44:18–20.

**2.** The defendant's attorney asked Deputy Peterson on cross, "Was your stop because the vehicle violated the law, or did you think that it had been—that you were dealing with an impaired driver, or what did you think?" Tr.

There were two individuals in the defendant's vehicle: the defendant and his passenger. Deputy Peterson advised the defendant that he pulled the defendant over because the defendant "drove on the shoulder a couple times." Ex. 1, video at 22:35:27; Tr. 12:15. Deputy Peterson also asked the defendant if the defendant was "ok to drive." [3] Ex. 1, video at 22:35:34, 22:35:53. The defendant responded by saying he was confused due to the Interstate 680/80 junction. Ex. 1, video at 22:35:49; Tr. 11:21–23. Deputy Peterson told the defendant that confusion at this location "happens quite a bit." Ex. 1, video at 22:35:50; Tr. 16:16–19.

Deputy Peterson then took the defendant back to his police cruiser to discuss with him the defendant's travel itinerary, destination, and purpose. Tr. 12:25, 13:1–3. After asking the defendant these types of questions, Deputy Peterson told the defendant that he was going to talk to the defendant's passenger. Ex. 1, video at 22:40:42. Before leaving the car, Deputy Peterson said to the defendant, "don't pet my dog." Ex. 1, video at 22:40:45. Deputy Peterson then asked the passenger similar questions to the ones he asked the defendant. Ex. 1, video at 22:41:27–22:43:06. The passenger had trouble speaking the English language. Ex. 1,

video at 22:41:19. Both the defendant and the passenger said they were traveling together, but gave some apparently inconsistent answers in response to Deputy Peterson's questions.[4] Ex. 1, video at 22:37:20–22:40:55, 22:41:27–22:43:04.

At about 10:50 p.m., Deputy Peterson left the defendant in his cruiser with his dog in order to summarize for another deputy, Deputy Olson, the events that had occurred up to that point.[5] Ex. 1, video at 22:49:30–22:51:03; Tr. 13:9–19, 33:16–17, 36:12–14. During that summary, Deputy Peterson discussed the possibility that the defendant had a "suicide load"[6] of narcotics or contraband in the vehicle, and testified that at this time, he "thought there was going to be a suitcase or a bag in the trunk with contraband in it." Tr. 17:10–21. Deputy Peterson then returned to the cruiser and gave the defendant a written warning for "driving on the shoulder." Tr. 14:2–3; 32:18–22. After issuing the written warning and giving back the defendant's license and passport, the defendant agreed to Deputy Peterson's request to ask the defendant some additional questions. Ex. 1, video at 22:53:52, 22:54:09–22:54:13; Tr. 14:3–9.

Deputy Peterson first asked the defendant a series of questions relating to whether there was any contraband in the defendant's vehicle.[7] Ex. 1, video at

---

38:13–16. Deputy Peterson responded, "For both reasons. For the traffic violation and possibly an impaired driver." Tr. 38:13–18.

3. Deputy Peterson also asked if the car was a rental car. Ex. 1, video at 22:36:03. The defendant said it was. Ex. 1, video at 22:36:04.

4. Having viewed the video of the traffic stop, Ex. 1, the court notes that the passenger's trouble with speaking the English language may have caused some of the apparent inconsistencies.

5. Deputy Peterson had previously emailed Deputy Olson asking Deputy Olson to come the location. Tr. 13:20–21.

6. Deputy Peterson testified that a "[s]uicide load refers to when people are driving vehicles," and "there's really no method of concealment of the narcotics or contraband." Tr. 17:17–19.

7. The questions Deputy Peterson asked the defendant included the following and in the following order: (1) "Everything in the vehicle belong to you guys?"; (2) "Anything stolen?"; (3) "Any guns?"; (4) "Knives?"; (5) "Any bombs?"; (6) "Any large amounts of marijuana?"; (7) "Large amounts of cocaine?"; (8) "Large amounts of heroin?"; (9) "Large amounts of cocaine?"; (10) "Meth?"; (11) "Large amounts of currency, cash?"; (12) "Anything over $10,000?". Ex. 1, video at 22:54:26–22:54:54.

22:54:29–22:54:54; Tr. 14:10–13. The defendant denied the presence of contraband in the vehicle. Tr. 14:14–16. Next, Deputy Peterson asked the defendant, twice, if the defendant would allow the deputies to search the defendant's vehicle. Ex. 1, video at 22:54:55; Tr. 14:17–20. The defendant told Deputy Peterson both times that the deputies could search the vehicle. Ex. 1, video at 22:54:55. After the defendant agreed to the search, Deputy Peterson advised the defendant that he had the right to refuse consent. Ex. 1, video at 22:54:56. Deputy Peterson then asked the defendant, "You sure ... nothing to hide?" Ex. 1, video at 22:55:01. The defendant said he did not. Ex. 1, video at 22:55:04. The deputy asked the defendant if he was sure one last time before the deputies searched the vehicle. Ex. 1, video at 22:55:12. The defendant did not change his initial consent or indicate to the deputies that he wanted the deputies to stop searching the vehicle. Tr. 15:3–9. The deputies left both the defendant and the passenger in one of the two cruisers, one per cruiser, with the doors closed, while the deputies searched the vehicle.[8] Tr. 16:3–6.

The deputies first searched the trunk of the vehicle. Ex. 1, video at 22:56:44; Tr. 17:6–9. The deputies did not find any contraband or anything suspicious there. Tr. 18:4–7. The deputies then searched the interior of the vehicle. Tr. 18:8–11. Deputy Peterson testified that when the deputies lifted the backseat of the vehicle,

they saw the vehicle's sending unit[9] and could smell gasoline. Tr. 19:4–5. Deputy Peterson testified that he could see suspicious scratches on the sending unit cover that are not usually present when a manufacturer performs maintenance on a vehicle. Tr. 19:5–6, 17–22. Deputy Olson then retrieved his tool bag from his cruiser so the deputies could remove the cover of the sending unit themselves.[10] Ex. 1, video at 23:05:58; Tr. 20:24–25, 21:1. Deputy Peterson testified that upon removing the sending unit's cover, the deputies could see eleven plastic bundles floating in the gas tank. Tr. 41:21–25, 42:1–2, 42:22–24. These bundles contained narcotics, including methamphetamine and cocaine. Ex. 1, video at 23:20:36; Tr. 42:13–23. The deputies then placed the defendant under arrest. Tr. 21:17–22; 22:22–25.

## DISCUSSION

Defendant argues in his motion to suppress that the court should suppress all evidence obtained as a result of the traffic stop. Filing No. 25. First, the defendant argues that Deputy Peterson stopped the defendant's vehicle without probable cause of unlawful conduct or a traffic violation. Filing No. 25. Defendant contends that driving on the shoulder for 100 feet for approximately one second does not constitute a traffic offense under Nebraska law, and, therefore, could not provide probable cause to stop the defendant's vehicle. Filing No. 26. Second, the defendant argues that if the initial stop were lawful, the stop

8. Deputy Peterson removed the passenger from the vehicle and escorted her back to Deputy Olson's cruiser. Ex. 1, video at 22:56:01.

9. A sending unit is a separate part of the gas tank that is screwed to the top of the gas tank. Tr. 38:3–4. Hoses from the gas tank go into the sending unit so that the sending unit can provide gasoline to the vehicle's engine and fuel the vehicle. Tr. 5:2–4, 38:3–7.

10. At this time, unknown to the deputies because they were attending to the defendant's vehicle while the defendant was inside Deputy Peterson's cruiser, the defendant said in Spanish, "Please, Virgin, I have sinned. Please forgive me," Tr. 23:16–18, and "Please, Virgin, I need a miracle. Help me." Tr. 23:19–20.

became unlawful because the deputies prolonged the traffic stop beyond the time reasonably required to complete the initial traffic stop. Filing No. 25. Defendant contends that the stop became unlawful because Deputy Peterson extended contact beyond the time necessary to issue a citation to or identify the defendant. Filing No. 26. As a result, the defendant contends that any consent the defendant gave to the deputies to search the vehicle was also unlawful. Finally, the defendant argues that the search exceeded the scope of any consent the defendant gave. Filing No. 25. Defendant contends that the consent he gave followed questions concerning his luggage in the trunk or other items in the passenger compartment of the vehicle, and, therefore, his consent was limited to searching those areas of the vehicle and did not include the sending tank. Filing No. 26.

After a hearing on defendant's motion to suppress, the magistrate judge recommended that the defendant's motion to suppress be granted. Filing No. 35. The magistrate judge was not convinced that "two brief instances of drifting for one second over the shoulder line is a traffic violation." Filing No. 35 at 4, 7. Additionally, the magistrate judge found that Deputy Peterson did not have an "objectively reasonable belief that [the defendant] was impaired." Filing No. 35 at 7. The magistrate judge reasoned that Deputy Peterson's prior knowledge that the Interstate 680/80 junction often confused drivers made it reasonable for Deputy Peterson to infer a confused driver crossed onto the

shoulder, not an impaired driver. Filing No. 35 at 7. Because the magistrate judge found Deputy Peterson stopped the defendant without legal justification, the magistrate judge also found that the evidence gleaned from the stop should be suppressed. Filing No. 35 at 8. As a result, the magistrate judge granted the defendant's motion to suppress.

The government objects to the magistrate judge's F & R. Filing No. 36. First, the government argues Deputy Peterson had probable cause to make the initial stop based on the vehicle crossing the shoulder line. Filing No. 36. Second, the government argues that even if the initial stop was unlawful, the defendant's consent to search the vehicle purged the "taint" from the initial unlawful stop and thereby rendered the evidence admissible. Filing No. 36. Finally, the government argues that even if there was no probable cause to believe the defendant violated a Nebraska traffic law, the circumstances provided Deputy Peterson with a reasonable suspicion that the defendant was impaired, justifying Deputy Peterson stopping the defendant's vehicle.[11] Filing No. 36.

## I. Traffic Violation

The government argues that Deputy Peterson had probable cause to stop the defendant's vehicle because the circumstances presented Deputy Peterson with an objectively reasonable basis to believe the defendant violated Neb.Rev.Stat. § 60–6,142, a Nebraska traffic law that generally prohibits driving on the shoulder

11. The first time the government presented the argument that Deputy Peterson had reasonable suspicion of an impaired driver was at the end of the hearing on defendant's motion to suppress. The government presented this argument only after Deputy Peterson changed his response between the prosecution's direct examination, and the defense's cross-examination, regarding why he decided

to pull over the defendant's vehicle. See supra notes 1–2 and accompanying text. Until that time, the government and Deputy Peterson only asserted that Deputy Peterson pulled over the defendant's vehicle for a traffic violation. See Filing No. 28, Pl.'s Br. in Opp'n to Mot. to Suppress; see also Tr. 50:2–25, 51:1–2.

of highways. The court agrees with the magistrate judge, and finds that Deputy Peterson did not have an objectively reasonable basis to believe the defendant "dr[o]ve on the shoulders of highways" by crossing briefly onto the shoulder of the highway.

■ A traffic stop is lawful if supported by probable cause or reasonable suspicion that a vehicle committed a traffic violation. *United States v. Washington,* 455 F.3d 824, 826 (8th Cir.2006). Regardless of its severity, a traffic violation provides probable cause to stop a vehicle. *Washington,* 455 F.3d at 826. To determine whether an officer had probable cause or reasonable suspicion to stop a vehicle, the court must determine whether the officer had an objectively reasonable basis to believe a traffic violation occurred. *Id.* at 826 (citing *United States v. Smart,* 393 F.3d 767, 770 (8th Cir.2005), *cert. denied,* 545 U.S. 1121, 125 S.Ct. 2921, 162 L.Ed.2d 306 (2005); *United States v. Thomas,* 93 F.3d 479, 485 (8th Cir.1996)); *United States v. Sanders,* 196 F.3d 910, 913 (8th Cir.1999). This is so even if the officer based the stop on a mistake of law. *Washington,* 455 F.3d at 826, 827. An officer's mistake of law is objectively reasonable if it is based on a statute's "counterintuitive and confusing language." *See United States v. Martin,* 411 F.3d 998, 1001 (8th Cir.2005) (finding objectively reasonable basis for stop).

■ Courts do not expect police officers to interpret traffic laws with the same expertise and subtlety as would a criminal defense attorney. *Sanders,* 196 F.3d at 913. However, "[t]here may be occasions when an officer's understanding of the law is simply unreasonable. In such a case, of course, the officer's belief that there is a traffic violation would not be sufficient to establish probable cause to stop the vehicle." *Id.* at 913 n. 3. Additionally, an officer's "subjective good faith belief about the content of the law is irrelevant to our inquiry, 'for officers have an obligation to understand the laws that they are entrusted with enforcing, at least to a level that is objectively reasonable.'" *Washington,* 455 F.3d at 827 (quoting *Martin,* 411 F.3d at 1001).

The traffic law Deputy Peterson pulled the defendant's vehicle over for was Neb. Rev.Stat. § 60–6,142. That law states:

No person shall drive on the shoulders of highways, except that:

(1) Vehicles may be driven on the shoulders of highways (a) by federal mail carriers while delivering the United States mail or (b) to safely remove a vehicle from a roadway;

(2) Implements of husbandry may be driven on the shoulders of highways; and

(3) Bicycles and electric personal assistive mobility devices may be operated on paved shoulders of highways included in the state highway system other than Nebraska segments of the National System of Interstate and Defense Highways.

Neb.Rev.Stat. § 60–6,142. The plain language of the statute prohibits driving on the shoulders of highways for use as thoroughfare or a primary travel area.[12] *See*

---

12. The government argues that *State v. Davis,* 2007 WL 2257886 (Neb.Ct.App.2007), requires this court to find that crossing onto the shoulder for one to two seconds is "driving" on the shoulder. Filing No. 37 at 6. The government cites a portion of that opinion which suggests that crossing onto the shoulder may constitute "driving" on the shoulder. However, the court in *Davis* did "not specifically address the question of whether momentarily crossing onto the shoulder is a violation of Neb.Rev.Stat. § 60–6,142." 2007 WL 2257886, at *2. Instead, the court only addressed whether a reasonable suspicion that the driver was impaired justified the stop. *Id.*

*United States v. Graumann*, No. 8:00–CR–61, Order at *3 (D.Neb. July 20, 2000) (quoting *State v. Latham*, No. CR 98–57, at *3 (Buffalo County, Neb. Sept. 10, 1998) ("It is readily apparent that the type of activity being prohibited by the statute, 60–6,142, is using the shoulders of a highway as a thoroughfare or primary travel area")) (unpublished opinion) (attached as Exhibit A); *cf. United States v. Adler*, 590 F.3d 581, 584 (8th Cir.2009) ("state courts are the ultimate expositors of state law") (quoting *Mullaney v. Wilbur*, 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975)). This statute prohibits driving on the shoulders of highways and then presents three exceptions to that rule that allow for use of the shoulder as a thoroughfare or a primary travel area. Additionally, Neb.Rev. Stat. § 60–6,142 was not meant to "criminalize and inadvertent momentary crossing onto the shoulder ... as a pretext to stop otherwise suspicious vehicles." *Graumann*, No. 8:00–CR–61, at *3 (quoting *Latham*, No. CR 98–57, at *3).

■ Even though Deputy Peterson is not charged with scrutinizing every detail of the statute, he is charged with understanding this law that he is entrusted to enforce. Neb.Rev.Stat. § 60–6,142 does not contain language that is counterintuitive and confusing. Its plain language shows "driving" on the shoulder refers to using the shoulder as a thoroughfare or primary travel area. Whether Deputy Peterson believed that crossing onto the shoulder constituted "driving" on the shoulder is irrelevant. Since it is readily

apparent that the purpose of Neb.Rev. Stat. § 60–6,142 is to prevent drivers from using the shoulder as a thoroughfare or primary travel area and Deputy Peterson is obligated to understand this law, it is simply unreasonable for him to believe that briefly crossing onto the shoulder violated Neb.Rev.Stat. § 60–6,142.[13] As a result, Deputy Peterson could not have had an objectively reasonable belief that the defendant violated § 60–6,142. Therefore, the court finds that Deputy Peterson did not have probable cause to pull the defendant's vehicle over for violating Neb.Rev. Stat. § 60–6,142 and adopts the F & R of the magistrate judge in this regard.

### II. Impaired Driver

The government argues that even if Deputy Peterson did not have probable cause to believe the defendant violated Neb.Rev.Stat. § 60–6,142, the circumstances presented Deputy Peterson with a reasonable suspicion that an impaired driver was operating the vehicle, sufficient to justify the traffic stop. The court finds that the traffic stop was not justified. Deputy Peterson did not have a reasonable suspicion that an impaired driver was operating the defendant's vehicle.

■ A police officer may stop a moving vehicle, even if he or she lacks probable cause, "to investigate a reasonable suspicion that its occupants are involved in criminal activity." *United States v. Winters*, 491 F.3d 918, 921 (8th Cir.2007) (quoting *United States v. Hensley*, 469 U.S. 221,

13. *But see United States v. Gutierrez*, 2008 WL 2415300, at *4, *5 (D.Neb. June 12, 2008) (stating "[t]he other conduct observed by [the officer], specifically driving over the center line and driving onto the shoulder of the road are also violations of Nebraska statute" and finding that the officer "had an objectively reasonable basis for believing the [vehicle] was in violation of Nebraska statutes and had breached any of three different traffic laws");

*United States v. Heir*, 107 F.Supp.2d 1088, 1094 (D.Neb.2000) (stating "[d]riving the vehicle onto the shoulder area and following another vehicle by less than two seconds provided the basis for [the officer] to stop the defendant, pursuant to NEB.REV.STAT.ANN § 60–6, 140 and 142" because "[s]uch moving violations provide probable cause for a traffic stop") (sic).

226, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)). "Reasonable suspicion must be based on 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the investigative stop'." *United States v. Long*, 532 F.3d 791, 795 (8th Cir.2008) (quoting *Winters*, 491 F.3d at 921). Reasonable suspicion is "less difficult to meet than the probable cause standard." *Long*, 532 F.3d at 795. It requires more than a hunch, but not more than a minimal, articulable, and objective justification for the investigatory stop. *Id.*

■■■ The court finds there was no objective evidence suggesting the driver of the defendant's vehicle was an impaired driver. First, a fair distance separated the two instances the vehicle crossed onto the shoulder. Second, each time, the vehicle was only on the shoulder for about one second. Third, of the two times the vehicle touched the shoulder, one was at the Interstate 680/80 junction, a location Deputy Peterson knew confused drivers. Finally, the defendant did not engage in any irregular driving other than the two instances already mentioned, including during the mile and a half Deputy Peterson followed the defendant after observing the last incident and before Deputy Peterson finally activated his lights. Although there is some authority from the Eighth Circuit suggesting crossing onto the shoulder may lead to a reasonable suspicion regarding the driver's ability to operate a vehicle,[14] taken together, the circumstances do not present an objective belief of an impaired driver.

Additionally, the court finds significant the fact that the government only first argued that reasonable suspicion of an impaired driver was justification for the stop at the end of the defendant's motion to suppress hearing. *See* Filing No. 28, Pl.'s Br. in Opp'n to Mot. to Suppress; Filing No. 34, Tr. 50:18–23. The government only did so after the defendant's attorney asked Deputy Peterson on cross-examination a leading question suggesting that impairment may have also been a justification for the traffic stop. Tr. 38:13–18. Deputy Peterson did not testify as to the alleged impairment until cross-examination. Even though Deputy Peterson asked the defendant whether he was "ok to drive," the circumstances of this case suggest the possibility of an impaired driver was simply the government's post-hoc rationalization brought about only because the defense brought its possibility to the government's attention.[15]

### III. Consent to Search

■■■ Because Deputy Peterson did not have probable cause or reasonable suspicion to stop the defendant's vehicle, the evidence obtained as a result of that illegal traffic stop is considered inadmissible

14. *See United States v. Long*, 532 F.3d 791, 794–795 (8th Cir.2008) (finding reasonable suspicion when vehicle crossed **center line and shoulder**) (emphasis added); *United States v. Mallari*, 334 F.3d 765, 766, 767 (8th Cir.2003) (finding reasonable suspicion when vehicle **without rear license plate illuminated** drove onto shoulder **three times**) (emphasis added).

15. The magistrate judge's F & R suggests the same result. The Honorable Thomas D. Thalken, former United States Deputy Attorney General, found that Deputy Peterson did not have an objectively reasonable belief that the defendant was impaired because the objective circumstances should have presented Deputy Peterson a suspicion of a confused driver, not an impaired one. Filing No. 35 at 7. Even though the magistrate judge did not expressly state it in his F & R, it is easy to infer that he addressed the impaired driver issue so quickly because he found Deputy Peterson was not a credible witness. The magistrate judge is the best judge of credibility, because he is the one who heard and saw Deputy Peterson testify.

"fruit" of that illegal stop unless means sufficiently distinguishable from the illegal activity allowed him to obtain the evidence and, therefore, purge the primary taint. *United States v. Yousif*, 308 F.3d 820, 829–30 (8th Cir.2002) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). This result is required by the exclusionary rule, the primary purpose of which is to deter future unlawful police conduct and remove the incentive to disregard an individual's constitutional rights. *Michigan v. Tucker*, 417 U.S. 433, 447, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) (quotation omitted). "The controlling question is 'whether granting establishment of the primary illegality, the evidence which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Yousif*, 308 F.3d at 829 (quoting *Wong Sun*, 371 U.S. at 488, 83 S.Ct. 407).

The magistrate judge, discussing the issue of consent for this court's benefit in case this court decided the initial traffic stop was lawful, found that the defendant consented voluntarily to Deputy Peterson searching the vehicle. Filing No. 35 at 10. The magistrate judge then discussed this issue with regard to whether the search exceeded the scope of the defendant's consent. In its objection to the magistrate judge's F & R, the government argues that even if there was no probable cause or reasonable suspicion to stop the defendant's vehicle, the defendant gave consent sufficient to break the nexus between the illegal stop and the resulting seizure of evidence. This court, however, finds that the defendant's consent to search was not sufficient to purge the taint of the initial illegal traffic stop.

■■■ A voluntary and consensual search does not violate an individual's Fourth Amendment rights. *United States*

*v. Meza–Gonzalez*, 394 F.3d 587, 592 (8th Cir.2005). A court may find that a consent is voluntary if it is "the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied." *United States v. Griffith*, 533 F.3d 979, 984 (8th Cir.2008) (internal quotation omitted). "Voluntariness is a question of fact to be determined from all the circumstances,' not just by focusing on a single statement made by the officer." *United States v. Moreno*, 280 F.3d 898, 900 (8th Cir.2002) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 231, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Circumstances the court must consider include the details of the interrogation and the characteristics of the accused. *Griffith*, 533 F.3d at 984.

■■■ Relevant details of the interrogation may include: (1) the length of the detention; (2) whether the police threatened, physically intimidated, or punished the defendant; (3) whether the defendant consented while in custody; (4) whether the defendant relied upon misrepresentations the police made; (5) whether the defendant was in a public or secluded place; and (6) whether the defendant objected or stood by silently while the search occurred. *Id.* at 984. Relevant details of the defendant may include: (1) the defendant's age and/or education; (2) whether the defendant was intoxicated; and (3) whether the defendant consented after being informed of his or her right to withhold consent. *Griffith*, 533 F.3d at 984. A court does not apply these factors mechanically. *Id.* Instead, they serve as a guide to the court's analysis. *Id.*

■■■ Voluntary consent purges the primary taint of an illegal stop if it was "sufficiently an act of free will." *Moreno*, 280 F.3d at 900 (quoting *United States v. Ramos*, 42 F.3d 1160, 1164 (8th Cir.1994), *cert. denied*, 514 U.S. 1134, 115 S.Ct. 2015,

131 L.Ed.2d 1013 (1995)). However, "[V]oluntary consent to search, which was preceded by an illegal police action does not automatically purge the taint of an illegal [seizure]." *United States v. Alvarez–Manzo*, 570 F.3d 1070, 1077 (8th Cir. 2009) (internal quotation omitted) (alterations in original). The Supreme Court provided three factors for courts to consider to determine if consent is sufficiently an act of free will so that it purges the primary taint of an illegal stop: (1) the temporal proximity of the illegality and the consent; (2) the purpose and flagrancy of the official misconduct; and (3) the presence of intervening circumstances. *Moreno*, 280 F.3d at 900(citing *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *United States v. Tovar*, 687 F.2d 1210, 1215 (8th Cir.1982)); *Yousif*, 308 F.3d at 830.

■ Consent is less likely to purge the taint of misconduct the closer in time it occurs relative to the initial misconduct. *Compare Brown* 422 U.S. at 604, 95 S.Ct. 2254 (taint not purged with two-hour gap), *with Hale v. Henderson*, 485 F.2d 266, 267–69 (6th Cir.1973) (taint purged with two-day gap), *cert. denied*, 415 U.S. 930, 94 S.Ct. 1442, 39 L.Ed.2d 489 (1974), and *United States v. Owen*, 492 F.2d 1100, 1108 (10th Cir.1974) (taint purged after four-day gap), *cert. denied*, 419 U.S. 965, 95 S.Ct. 227, 42 L.Ed.2d 180 (1974). The defendant gave the alleged voluntary consent only 20 minutes after the illegal stop. This length of time is not sufficient to purge the primary taint. *See Brown*, 422 U.S. at 604, 95 S.Ct. 2254.

Deputy Peterson stopped the defendant's vehicle despite having no legal justification to do so. As Deputy Peterson testified, he followed the defendant's vehicle because it had out-of-state license plates. He witnessed the defendant's vehicle cross over onto the shoulder of the highway on two occasions, separated by a fair distance, the later of which occurred at a location where he knew drivers often got confused. After one and a half miles and the defendant "follow[ing] every traffic law requirement," Tr. 31:19–25, 32: 3–6, Deputy Peterson finally decided to activate his lights and pull over the defendant's vehicle. No more than 15 minutes into his encounter with the defendant, he believed there were drugs in the vehicle.

■ An officer advising a defendant of his or her right to refuse consent to search before a search takes place is usually an intervening circumstance that supports the voluntariness of a defendant's consent. *See Moreno*, 280 F.3d at 901. However, this is the case only if the officer advises the defendant of his or her right to refuse consent before the defendant consents to the search. *See Griffith*, 533 F.3d at 984 (advice of right to refuse consent prior to defendant's consent supports voluntariness). Here, the defendant consented to the search before he was informed of his right to withhold consent.

■ Looking to all of the circumstances, the court finds that the defendant's consent was not sufficient to purge the taint resulting from the initial illegal traffic stop. The defendant was secluded in a police cruiser after the police pulled him over for an invalid reason and then began asking him incriminating questions. This is an inherently coercive situation. Additionally, the defendant consented to the search only 20 minutes after the police pulled him over for an invalid reason and before he was advised of his right to refuse consent. Accordingly, the defendant's motion to suppress is granted and evidence obtained from the traffic stop and subsequent search is suppressed.

THEREFORE, IT IS ORDERED:

1. The government's objection to the magistrate judge's F & R, Filing No. 36, is overruled as set forth herein;

2. The defendant's motion to suppress, Filing No. 25, is granted as set forth herein; and

3. The F & R of the magistrate judge, Filing No. 35, is adopted in part and rejected in part.

## FINDINGS AND RECOMMENDATIONS

THOMAS D. THALKEN, United States Magistrate Judge.

This matter is before the court on Alberto Magallanes' (Magallanes) Motion to Suppress. See Filing No. 25. Magallanes is charged in the two-count Indictment with (1) possession with the intent to distribute 500 grams or more of a substance containing methamphetamine, and (2) possession with the intent to distribute 500 grams or more of a substance containing cocaine, on or about November 30, 2009, in violation of 21 U.S.C. § 841(a)(1) and (b)(1.) See Filing No. 1. Magallanes seeks to suppress and exclude all information obtained as a result of a traffic stop and subsequent search of the vehicle on November 30, 2009, in Douglas County, Nebraska. See Filing No. 25.

On May 11, 2010, the court held an evidentiary hearing on the defendant's motion. Assistant United States Attorney Robert C. Sigler represented the United States. Magallanes was present with his court appointed counsel James J. Regan. Laura GarciaHein served as the interpreter in the Spanish language. Douglas County Sheriff's Deputy Kristopher Peterson (Deputy Peterson) testified at the hearing. The court received into evidence one audio/video disk of the traffic stop (Exhibit 1), and copies of Nebraska Revised Statutes § 60–6,142 (Exhibit 101) and § 60–6,139 (Exhibit 102) of Nebraska traffic laws. On May 15, 2010, a transcript (TR.) of the hearing was filed, whereupon the motion was deemed submitted. See Filing No. 34.

## FINDINGS OF FACT

Deputy Peterson has been with the Douglas County Sheriff's Office for a little over ten years and has been assigned to the K–9 interdiction unit for approximately five years as of May 11, 2010 (TR. 5). Deputy Peterson's duties in the K–9 interdiction unit include conducting traffic stops on the interstate system in Douglas County and enforcing local, state and federal traffic laws (TR. 6). On November 30, 2009, at about 10:30 in the evening, Deputy Peterson was stopped in the median on Interstate 80 facing eastbound at Harrison Street (TR. 24). Deputy Peterson observed a silver or charcoal color Nissan Altima with Arizona license plates (TR. 7). Deputy Peterson observed the Nissan, traveling at the speed limit, pass him heading eastbound (TR. 26). Deputy Peterson decided to follow the Nissan because the vehicle had out-of-state license plates (TR. 25–26). Deputy Peterson followed and observed the Nissan cross over the shoulder line on two separate occasions (TR. 7).

On each occasion the Nissan traveled approximately 100 feet forward while over the shoulder line for about one second (TR. 28), and only the width of the tires crossed onto the shoulder (TR. 44). The first incident occurred at about L Street/I Street (TR. 27). The second incident occurred on a curve at the Interstate 680/I–80 junction (TR. 29–30). Deputy Peterson followed the Nissan for at least one mile before he activated his lights and camera (TR. 27, 30–31). Deputy Peterson did not observe any traffic violations from the I–680/I–80 interchange to 72nd Street where the Nissan came to a stop (TR. 32). The Nissan stopped on the 72nd Street off

ramp and the deputy approached the Nissan on the passenger side (TR. 11).

There were two people in the Nissan: the driver, identified as Magallanes, and a female passenger (TR. 11). After approaching the Nissan, the deputy explained to Magallanes the stop occurred because Magallanes "drove on the shoulder a couple times" (Ex. 1–22:35:26). Deputy Peterson also testified he stopped the vehicle "for the traffic violation and possibly an impaired driver" (TR. 38). Deputy Peterson asked for the driver's paperwork and license (TR. 12). Magallanes told the deputy he was confused about the I–680/I–80 junction (TR. 12). Deputy Peterson mentioned to Magallanes getting confused at that specific junction "happens quite a bit." (Ex. 1–22:35:45).

Deputy Peterson asked Magallanes to sit in the police cruiser while the deputy completed paperwork and where the deputy asked some questions concerning Magallanes' travel plans (Ex. 1–22:36:22; TR. 12–13). Magallanes initially stated they, he and his wife, were traveling to Indiana, then amended his statement to say that while they were traveling to Indiana, they were also going to Philadelphia for three days to attend the funeral of someone he did not know the name of, but whom his "wife" knew (Ex. 1–22:37:00–22:41:00). Magallanes also stated he may find work in Indiana, where he was going to stay with a cousin whose address he did not know, but would call upon arrival (*Id.*).

Magallanes remained in the cruiser while Deputy Peterson returned to the Nissan to talk to the female passenger (TR. 13). She told Deputy Peterson they, she and her boyfriend, were traveling straight to Philadelphia to look for work (Ex. 1–22:41:05 –22:43:00). She stated she did not know how long they were going to stay in Philadelphia (*Id.*). Deputy Peterson understood the travel itinerary information to be conflicting from the two occupants (TR. 35). Deputy Olson arrived on the scene at Deputy Peterson's request (TR. 13). Deputy Peterson gave Magallanes a written warning ticket for driving on the shoulder (TR. 32).

After the warning ticket was given, Magallanes agreed to allow Deputy Peterson to ask some additional questions (TR. 14). Deputy Peterson asked whether there was drugs, money, weapons, or other contraband in the Nissan (TR. 14). Magallanes denied having narcotics, contraband, or weapons in the Nissan (TR. 14). Deputy Peterson asked whether there was any luggage in the Nissan and whether all of the items in the Nissan were his (TR. 33–34). Deputy Peterson asked Magallanes, "Can I search the vehicle?," and advised Magallanes more than once that he could refuse consent (TR. 14–15). Magallanes consented to a search of the vehicle (TR. 14). The deputies asked the female passenger to exit the Nissan prior to conducting the search (TR. 15). The two individuals were not handcuffed or restrained in any way during the search of the Nissan (TR. 16). During the entire search, Magallanes never revoked his consent to search the Nissan (TR. 15).

Deputies Olson and Peterson did not find contraband or other suspicious items in the trunk (TR. 17–18). When they turned their focus to the inside of the Nissan, the deputies lifted up the backseat and immediately smelled the odor of fresh gas (TR. 18–19). The deputies observed fresh tool mark scratches on the sending unit that sits on top of the gas tank (TR. 19). Deputy Olson left the Nissan to retrieve a tool bag from his cruiser in order to remove the sending unit cover (TR. 20–21). Unbeknownst to the deputies, when Magallanes saw Deputy Olson returning to the Nissan with the tool bag, the microphone recording in the cruiser recorded Magallanes speaking in Spanish saying,

"Please, Virgin, I have sinned. Please forgive me." (TR. 23). Several minutes later, Magallanes was heard on the recording saying, "Please, Virgin, I need a miracle. Help Me." (TR. 23).

After removing the sending unit cover, the deputies smelled more gasoline and noticed fresh tooling and smudges in the dirt on top of the sending unit itself (TR. 41). The deputies removed the sending unit and lifted it up about halfway to see plastic bundles floating in the gas tank (TR. 42). The deputies did not remove the plastic bundles at that time, but, based on their experience, believed the bundles contained narcotics (TR. 42). Deputy Peterson placed Magallanes under arrest (TR. 22). A total of eleven bundles of narcotics, wrapped several times in plastic, were later removed from the gas tank (TR. 42–43).

## LEGAL ANALYSIS

### A. Traffic Stop

Magallanes argues Deputy Peterson lacked probable cause to make the initial stop of the Nissan because Magallanes committed no traffic violation. Specifically, Magallanes contends briefly crossing the shoulder line does not constitute a violation of Nebraska Revised Statutes § 60–6,142, which provides "[n]o person shall drive on the shoulders of highways," except under certain circumstances which do not apply here.

"It is well-established that any traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver." *United States v. Washington,* 455 F.3d 824, 826 (8th Cir. 2006) (internal quotation and citations omitted). "To determine whether a traffic stop was based on probable cause or was merely pretextual, an 'objective reasonableness' standard is applied." *United States v. Mallari,* 334 F.3d 765, 766 (8th Cir.2003). "An officer is justified in stop-

ping a motorist when the officer 'objectively has a reasonable basis for believing that the driver has breached a traffic law.'" *Id.* at 766–67 (quoting *United States v. Thomas,* 93 F.3d 479, 485 (8th Cir.1996.))

This court is not convinced that, absent more, two brief instances of drifting for one second over the shoulder line is a traffic violation. See *United States v. Graumann,* 8:00CR61 (order on report and recommendation, July 20, 2000). Deputy Peterson did not observe any grounds to stop the Nissan from the time Magallanes crossed the shoulder line at the I–680/80 junction to the time Deputy Peterson activated his lights near 84th street.

Although there is authority from the Eighth Circuit Court of Appeals concluding driving onto a highway shoulder violates section 60–6,142, this case is distinguishable on its facts. In two Eighth Circuit cases the defendants argued the officers lacked probable cause to make the traffic stop based on a violation of section 60–6,142. The officer in the most recent case, *Mallari,* observed the defendant operate a vehicle without the rear licence plate illuminated and cross over the right shoulder line three times at approximately 2:00 a.m. See *Mallari,* 334 F.3d at 766. In regard to driving on the shoulder, the court specifically noted that "weaving three times over the shoulder line in a short span of interstate, constitutes a violation of section 60–6,142 and probable cause to stop Mallari's vehicle." *Id.* at 767. Additionally, the officer wanted to determine the defendant's ability to drive. *Id.* at 766. In the second case, the court determined probable cause existed to initiate the traffic stop where a state trooper saw the tires of a motor home cross the shoulder line four times. *United States v. Pollington,* 98 F.3d 341, 342 (8th Cir.1996.)

Here, merely the width of the Nissan's tires crossed the shoulder line and only

twice for one second. Furthermore, a fair distance of interstate separated the occurrences. This alone does not constitute a violation of section 60–6,142, or give probable cause to make a traffic stop. Also, from the time Deputy Peterson began following the Nissan he only observed Magallanes cross the shoulder line and nothing more. No additional factor existed such as the unilluminated license plate in *Mallari* that could have given Deputy Peterson an objective reason for stopping the vehicle.

Other courts interpreting related statutes have suppressed evidence obtained from traffic stops made without an objectively reasonable basis for the initial stop of the vehicles.[1] In *United States v. Freeman*, 209 F.3d 464 (6th Cir.2000), the officer making the stop saw the defendant's vehicle cross the shoulder line for an estimated twenty to thirty feet. *Id.* at 465. The court then stated "we can not ... agree that one isolated incident of a large motor home partially weaving into the emergency lane for a few feet and an instant in time constitutes" a violation of Tennessee law. *Id.* at 466. Similarly, Magallanes only crossed over the shoulder line for an instant in time and a short distance of approximately 100 feet.

In *United States v. Gregory*, 79 F.3d 973 (10th Cir.1996), the Tenth Circuit Court of Appeals ruled on a similar case. There, the officer saw the defendant's "U-haul rental truck cross two feet into the right shoulder emergency lane" one time and decided to stop the vehicle. *Id.* at 976–77. The officer testified the conduct may have indicated a sleepy or intoxicated driver, and did not mention any further driving

irregularities. *Id.* at 977. The court stated, "We do not find that an isolated incident of a vehicle crossing into the emergency lane of a roadway is a violation of Utah law." *Id.* at 978. In the present case, Deputy Peterson similarly testified that he observed only the width of the Nissan's tires cross over the shoulder line and no irregular driving while following Magallanes.

In *Gastellum*, a vehicle was pulled over for a single instance of crossing the shoulder line by approximately two feet. *United States v. Gastellum*, 927 F.Supp. 1386, 1392 (D.Col.1996). The incident took place on a curved section of the road and the vehicle only crossed the shoulder line for just under a second. *Id.* at 1387. Ultimately, the court suppressed the evidence obtained from the traffic stop and concluded under these circumstances, the driver did not violate Colorado law. *Id.* at 1393. Likewise, Magallanes crossed, for about one second, over the shoulder line on a curved section of the road.

Nebraska Revised Statutes § 60–602 declares the legislative purpose of the Nebraska Rules of the Road. The first purpose listed is "[t]o make more uniform highway traffic laws between states." Neb. Rev. Stat. § 60–602(1). With this in mind, the court is of the view that the Nebraska legislature enacted section 60–6,142 to prohibit drivers from "driving" on the shoulder, that is, using the shoulder as a thoroughfare or for primary travel. The Nebraska Supreme Court has not commented on the purpose of section 60–6,142, but there is Nebraska case law to support this notion.[2] Under these circumstances,

---

**1.** These cases interpret statutes relating to driving a vehicle as nearly as practicable entirely within a single lane, rather than a statute pertaining specifically to driving on the shoulder like the one at issue. See Tenn. Code Ann. § 55–8–123(1;) Colo. Rev. Stat.

§ 42–4–1007(1)(a;) Utah Code Ann. § 41–6a–710(1)(a).

**2.** See *Graumann*, 8:00CR61 (Order quoting *Nebraska v. Latham*, No. CR 98–57, Buffalo County, Neb. Sept. 10, 1998 (concluding purpose of statute is not to criminalize briefly

it is fair to understand the purpose of the law is not to criminalize a driver for momentarily crossing the shoulder line for one second.

Deputy Peterson did testify he pulled the vehicle over because it had crossed the shoulder line and he thought the driver, Magallanes, could possibly have been impaired. During the traffic stop Magallanes explained his confusion to Deputy Peterson about which freeway to follow at the I–680/I–80 junction. Deputy Peterson mentioned to Magallanes the I–680/I–80 junction causes frequent confusion for drivers. Based on Deputy Peterson's prior knowledge, it is reasonable to think Deputy Peterson would infer a confused driver crossed the shoulder line, not an impaired driver. The court finds Deputy Peterson had no objectively reasonable belief that the Nissan's driver was impaired.

Nevertheless, Deputy Peterson continued to follow Magallanes for a distance after Magallanes crossed the shoulder line at the junction and at no point did he have an objectively reasonable basis for making the traffic stop. See *United States v. Lyons*, 7 F.3d 973, 976 (10th Cir.1993) ("[I]f failure to follow a perfect vector down the highway or keeping one's eyes on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy."), *overruled on other grounds by United States v. Botero–Ospina*, 71 F.3d 783, 787 (10th Cir.1995). The Nebraska Supreme Court observed, "it is a matter of common knowledge that careful drivers not only may on occasion, but frequently must, use the shoulders to some extent as a part of the highway...." *Richardson v. Nebraska*, 200 Neb. 225, 263 N.W.2d 442, 446 (Neb.1978). The court concludes that,

crossing over the shoulder line)). But see *Nebraska v. Davis*, No. A–07–104, 2007 WL 2257886, at *1 (Neb.App. Aug. 7, 2007) (con-

without more, Magallanes' conduct of crossing the shoulder line on two separate occasions where only the width of the tire entered the shoulder for one second does not create probable cause to make a traffic stop pursuant to section 60–6,142. The court finds Deputy Peterson had no objectively reasonable belief that the Nissan's driver had violated a traffic law.

 The exclusionary rule prohibits the admission of evidence unconstitutionally obtained. *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). This applies to tangible and testimonial evidence derived directly or indirectly from the unconstitutionally obtained evidence, i.e., the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). Because the court determined the Nissan was stopped without legal justification, the evidence stemming from the stop should be suppressed. All evidence and statements requested to be suppressed as the fruit of an illegal stop should be suppressed pursuant to *Wong Sun*. Accordingly, the court determines the defendant's motion to suppress should be granted and any evidence derived from the stop of the Nissan should be suppressed.

**B.**

Despite such determination, the court will address, arguendo, the issues of unreasonable detention and exceeding the scope of search raised by Magallanes.

**1. Detention**

Magallanes argues Deputy Peterson unreasonably prolonged the detention for the

cluding briefly crossing the shoulder line is a violation of Nebraska law).

traffic stop in violation of the Fourth Amendment. See Filing No. 26–Brief, p. 1. "[T]he officer [is] entitled to conduct an investigation reasonably related in scope to the circumstances that initially prompted the stop." *United States v. Lyons,* 486 F.3d 367, 371 (8th Cir.2007) (quoting *United States v. McCoy,* 200 F.3d 582, 584 (8th Cir.2000) (per curiam)). The Eighth Circuit Court of Appeals has set a reasonable procedure for law enforcement officers with respect to reasonable detention:

> During a traffic stop, an officer may detain the occupants of the vehicle while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation. The tasks include asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose. An officer may ask passengers these questions. If complications arise during these routine tasks, the vehicle may reasonably be detained for a longer duration than when a stop is strictly routine. Whether a traffic stop is reasonable in length is a fact intensive question, and there is no per se time limit on all traffic stops.

*United States v. Peralez,* 526 F.3d 1115, 1119 (8th Cir.2008) (internal quotations and citations omitted).

Deputy Peterson followed the correct procedure laid out by the Eighth Circuit. The length of the traffic stop was directly related to the performance of routine tasks. Deputy Peterson asked for Magallanes' license and other paperwork, explained the purpose of the stop, separated the two occupants and asked them about their destination of travel, itinerary, and purpose for travel without any unreasonable delay. The traffic stop concluded with issuance of the warning ticket.

"If the responses of the detainee and the circumstances give rise to suspicions unre-

lated to the traffic offense, an officer may broaden his inquiry to satisfy those suspicions." *United States v. Ward,* 484 F.3d 1059, 1062 (8th Cir.2007) (internal quotation omitted). Deputy Peterson received conflicting travel itinerary from the two occupants. Although Deputy Peterson could have broadened his inquiry to satisfy suspicions arising from the conflicting travel itinerary without consent, he inquired of Magallanes whether he would answer more questions. Magallanes consented to Deputy Peterson's request, and at that point Deputy Peterson began asking questions in regard to drugs, money, and weapons being in the Nissan. Magallanes' consent to answer additional questions was a consent to an additional period of detention. At that time, the conversation was during a consensual encounter. Accordingly, Deputy Peterson did not violate Magallanes' constitutional rights of unreasonable detention when issuing the warning ticket.

### 2. Search

Magallanes was asked and gave consent to search the Nissan. Magallanes argues his Fourth Amendment rights were violated when Deputy Peterson exceeded the scope of Magallanes' consent to search the vehicle. See Filing No. 26–Brief, p. 2. The Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *U.S. Const. amend. IV*; see *United States v. Ameling,* 328 F.3d 443, 447 (8th Cir.2003) (Fourth Amendment applies to the states through the Fourteenth Amendment.). "A consensual search does not violate the Fourth Amendment if the consent was voluntarily given without coercion." *United States v. Meza–Gonzalez,* 394 F.3d 587, 592 (8th Cir.2005). "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must

have (actual or apparent) authority to do so." *United States v. Williams*, 521 F.3d 902, 906 (8th Cir.2008). A party may withdraw consent to search only by "an unequivocal act or statement to indicate withdrawal of the consent." *United States v. McMullin*, 576 F.3d 810, 815 (8th Cir. 2009). "The standard for measuring the scope of a [person's] consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* (citing *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)). "In assessing the scope of consent, we must examine the totality of the circumstances, including the language of [a person's] consent and his actions while the officers were conducting their search." *United States v. Starr*, 533 F.3d 985, 996 (8th Cir.2008.)

In examining the totality of the circumstances, it is clear Magallanes unequivocally and voluntarily gave consent to Deputy Peterson to search the vehicle. Deputy Peterson asked Magallanes for permission to search the vehicle. Magallanes consented to a search of the vehicle. Deputy Peterson advised Magallanes more than once he was under no obligation to consent to the search. Although Deputy Peterson's line of questioning prior to asking for consent dealt primarily with luggage in the trunk and belongings in the vehicle, the consent given was to search *the vehicle* and was not specifically limited to a search of the trunk or the luggage. Magallanes' consent is reasonably interpreted to include searching any part of the vehicle.

Magallanes did not withdraw consent at any time during the search. The court notes Magallanes' inaction during the search indicated he did not try to revoke or limit the scope of the search. Rather than telling Deputy Peterson to stop the search when he saw Deputy Olson carry a tool bag toward the Nissan, Magallanes remained where he was and prayed to the Virgin for forgiveness and a miracle. Accordingly, Deputy Peterson did not exceed the scope of the search beyond the consent given by Magallanes when he lifted up the backseat and dismantled the sending unit.

## CONCLUSION

The court concludes Deputy Peterson lacked probable cause to make the initial stop of the vehicle solely on the above mentioned incidents of crossing the shoulder line. Therefore, the motion to suppress evidence obtained based on the traffic stop on November 30, 2009, should be granted. Nevertheless, the court determines no further violation of Magallanes' constitutional rights occurred during the detention from the traffic stop or during the subsequent search of the vehicle.

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

Alberto Magallanes' Motion to Suppress (Filing No. 25) be granted.

## ADMONITION

Pursuant to NECrimR 59.2 any objection to these Findings and Recommendations shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of these Findings and Recommendations. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

## EXHIBIT A

### IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA UNITED STATES OF AMERICA, Plaintiff

988

vs.

DARYL GRAUMANN, and TROY E. MARTIN, Defendants.

8:00CR61

## ORDER

Before the court is filing no. 34, the "Report and Recommendation" of Magistrate Judge Thomas D. Thalken. In his Report and Recommendation, Magistrate Judge Thalken recommends that this court grant the two motions to suppress (filing nos. 17 and 21)filed by the defendants, Daryl Graumann and Troy E. Martin. The government has filed a Statement of Objection (filing no. 35) to Magistrate Judge Thalken's Report and Recommendation (filing no. 34). Accordingly, the court has conducted an independent and de novo review of the record concerning Magistrate Judge Thalken's Report and Recommendation (filing no. 34), including the transcript (filing no. 33) and accompanying exhibits related to the hearing held by Magistrate Judge Thalken on May 3, 2000 on the defendants' motions to suppress (filing nos. 17 and 21). *See* 28 U.S.C. § 636(b)(1)(C) and NELR 72.4.

## BACKGROUND

On February 4,2000, Trooper Danny Covert of the Nebraska State Patrol was on duty and traveling east on Interstate 80. (filing no. 33 at 11:5–22) While driving east, Trooper Covert observed that he was overtaking a recreational vehicle also headed East on Interstate 80. (filing no. 33 at 47: 15–19) When the recreational vehicle was approximately 70 yards ahead of Trooper Covert's cruiser, Trooper Covert observed the recreational vehicle momentarily drift approximately one foot onto the south shoulder [1] of Interstate 80. (filing no. 33 at 41: 16–21;. 58: 13–17) Believing that the driver of the recreational vehicle had

violated Neb.Rev.Stat. § 60–6,142 which prohibits vehicles from driving on the shoulder of a highway, Trooper Covert pulled over the recreational vehicle. (filing no. 33 at 36: 8–11; 37: 21–25; 84:14–22) During the traffic stop, Trooper Covert discovered a large quantity of marijuana located in the recreational vehicle.

Each of the defendants subsequently moved to suppress all evidence obtained by the government during, and as a result of, the traffic stop. In their motions to suppress (filing nos. 17 and 21), the defendants contended that Trooper Covert did not have probable cause to pull over their recreational vehicle, because a vehicle's momentarily crossing the line separating the highway from its shoulder is not a violation of the Nebraska Rules of the Road, Neb.Rev.Stat. §§ 60–601–6,374 (1999). After an evidentiary hearing on the defendants' motions to suppress (filing nos. 17 and 21), Magistrate Judge Thalken filed his Report and Recommendation in which he recommended that "Graumann's motion to suppress (Filing no. 17) and Martin's motion to suppress (Filing no. 21) be granted." (filing no. 34 at 5) In recommending that the court grant the defendants' motions to suppress (filing nos. 17 and 21), Magistrate Judge Thalken stated that "[w]hile driving on the shoulder of a highway is a violation of Nebraska Revised Statute § 60–6,142, briefly crossing over a white line onto the shoulder area, without more, does not constitute a violation of Nebraska law." (filing no. 34 at 3) Objecting to Magistrate Judge Thalken's Report and Recommendation (filing no. 34), the government asserts that briefly crossing onto the shoulder area of an interstate highway is a violation of Neb.Rev.Stat. § 60–6,142, and, therefore, Trooper Covert had probable cause to stop the defendants' recreational vehicle.

---

1. The Nebraska Rules of the Road define "shoulder" as "that part of the highway contiguous to the roadway and designed for the accommodation of stopped vehicles, for emergency use, and for lateral support of the base and surface courses of the roadway." Neb. Rev.Stat. § 60–661.

## ANALYSIS

"It is well established ... that any traffic violation, no matter how minor, provides a police officer with probable cause to stop the driver of the vehicle." *United States v. Pereira–Munoz*, 59 F.3d 788, 791 (8th Cir.1995) (citing cases). In what appears to be a case of first impression in this Circuit, the sole issue in this case is whether Trooper Covert actually witnessed a violation of Neb.Rev.Stat. § 60–6,142 when he observed the defendants' recreational vehicle momentarily drift partially onto the shoulder of Interstate 80. Section 60–6,142, entitled "Driving on highway shoulders prohibited; exceptions," provides as follows:

No person shall drive on the shoulders of the highways, except that:

(1) Vehicles may be driven on the shoulders of highways (a) by federal mail carriers while delivering the United States mail or (b) to safely remove a vehicle from a roadway;

(2) Implements of husbandry may be driven on the shoulders of highways; and

(3) Bicycles may be operated on paved shoulders of highways included in the state highway system other than Nebraska segments of the National System of Interstate and Defense Highways.

Neb.Rev.Stat. § 60–6,142.

Whether a vehicle's momentarily being partially on a highway shoulder constitutes "driving" on a highway shoulder in violation of Section 60–6,142 was addressed by Judge John P. Icenogle of the District Court for Buffalo County, Nebraska. In *State v. Latham*, No. CR 98–57 (Buffalo County, Neb. Sept. 10, 1998), Judge Icenogle held that:

It is readily apparent that the type of activity being prohibited by the stat-

ute, 60–6,142, is using the shoulders of a highway as a thoroughfare or a primary travel area. This is readily ascertainable insomuch as the statute provides exceptions for the use of the shoulder as a primary travel area in certain situations involving mail carriers, removal of vehicles from roadways, driving implements of husbandry down the shoulders of a highway, and the operation of bicycles on paved shoulders.

\* \* \* \* \* \*

The purpose of 60–6,142 is not to criminalize an inadvertent momentary crossing onto the shoulder, the use of the shoulder by drivers for emergency situations such as fixing flat tires, or as a pretext to stop otherwise suspicious vehicles.

*Id.* at 3. The court has examined Judge Icenogle's persuasive opinion concerning whether Section 60–6,142 is violated by a vehicle's moving partially onto the shoulder of a highway. *Cf. Hillside Enterprises, Inc. v. Continental Carlisle, Inc.*, 147 F.3d 732, 735 n. 4 (8th Cir.1998) ("It is not the place of the federal courts ... to reexamine state court determinations of state law questions.").

Although the government cites opinions rendered by the Eighth Circuit Court of Appeals for the government's position that briefly driving onto a highway shoulder violates Section 60–6,142, the court finds the cited cases are distinguishable on their respective facts. For example, most of the decisions cited by the government involved drivers who were engaged in conduct that violated other provisions [2] of the Nebraska Rules of the Road. *See, e.g., United States v. Pollington*, 98 F.3d 341, 342 (8th Cir. 1996) ("On March 29, 1995, after the **fourth time** Trooper Christopher Thomp-

2. Drifting repeatedly onto a highway shoulder would undoubtedly give an officer probable

cause to stop the vehicle for violation of Sec-

son saw the tires of a motor home go over the interstate shoulder line, he pulled the vehicle over.") (emphasis added); *United States v. Miranda–Garcia,* 23 F.3d 1331, 1333 (8th Cir.1994) ("Trooper Schenck . . . observed a U–Haul rental truck in front of him drive its right wheels onto the shoulder of the roadway **three times,** once as far as two and one-half feet off the traveled portion of the interstate.")(emphasis added); *United States v. Barahona,* 990 F.2d 412, 416 (8th Cir.1993) ("Trooper Chitwood observed Barahona's vehicle **change lanes without using a turn signal,** and then drive partially onto the shoulder of the road and back onto the highway.") (emphasis added); *United States v. Cortez,* 935 F.2d 135, 142 (8th Cir.1991) ("In the present case, Sergeant Elliott observed the van Cortez was driving go onto the highway's shoulder **twice** and then **cross into the passing lane as another car was trying to pass it.**") (emphasis added).[3]

When confronted with facts similar to those found in the present case, courts have frequently suppressed all evidence obtained from such traffic stops, because there was insufficient justification for an initial stop of the vehicles. *See. e.g., United States v. Freeman,* 209 F.3d 464, 466 (6th Cir.2000) ("We can not . . . agree that

one isolated incident of a large motor home partially weaving into the emergency lane for a few feet and an instant in time constitutes" a violation of Tennessee law.); *United States v. Gregory,* 79 F.3d 973, 978 (10th Cir.1996) ("We do not find that an isolated incident of a vehicle crossing into the emergency lane of a roadway is a violation of Utah law."); *United States v. Ochoa,* 4 F.Supp.2d 1007, 1012 (D.Kan. 1998) ("The court finds under the facts of this case that Ochoa's single crossing onto the shoulder was not a violation of Kansas law."); *United States v. Gastellum,* 927 F.Supp. 1386, 1393 (D.Col.1996) (suppressing evidence obtained from a traffic stop and concluding that "a single instance of weaving over the shoulder" did not violate Colorado law).[4]

In this case, Trooper Covert observed the recreational vehicle for approximately 60–90 seconds before stopping the vehicle. (filing no. 33 at 40:16–18) While overtaking the defendants' recreational vehicle, Trooper Covert did not observe the recreational vehicle exceed the speed limit (filing no. 33 at 37:19–20), nor did he see the vehicle weaving in its own lane (filing no. 33 at 37:21–25). The recreational vehicle, which is approximately 35 feet long (filing no. 33 at 12:6–8), and wider than a police cruise[5] (filing no. 33 at 36:18–37:13), drove

---

tion 60–6,196 (Driving under influence of alcoholic liquor or drug) or Section 60–6,212 (Careless driving).

3. In addition, the defendant in at least one of the cases cited by the government did not even contest the validity of the initial traffic stop. *See, e.g., United States v. Portmann,* 207 F.3d 1032, 1032 (8th Cir.2000) (defendant stopped for driving onto the shoulder of an interstate highway; however, lack of probable cause for the initial stop of the vehicle not raised by Portmann).

4. The court is mindful that one of the purposes of enacting the Nebraska Rules of the

Road was to "make more uniform highway traffic laws between states." Neb.Rev.Stat. § 60–602(1). Indeed, the Nebraska legislature expressed its intention that the Nebraska Rules of the Road "be so interpreted and construed as to effectuate their general purpose to make uniform the laws relating to motor vehicles." Neb.Rev.Stat. § 60–604.

5. Exhibit 102, received during the May 3, 2000 hearing, shows the defendants' recreational vehicle completely occupying the entire width of the interstate shoulder after being stopped.

on the shoulder for approximately 25–30 feet[6] (filing no. 33 at 41:22–24), a distance which is less than one length of the recreational vehicle. There was a wind blowing toward the south at the time of the traffic stop (filing no. 33 at 38:4–6), and the recreational vehicle is a taller vehicle (filing no. 33 at 36:15–17), making the vehicle more susceptible to gusts of wind. *See Freeman*, 209 F.3d at 466 (motor home weaving once onto shoulder on a windy day does not establish probable cause to justify a traffic stop); *Gregory*, 79 F.3d at 978 (U–Haul truck weaving once onto shoulder does not establish probable cause to justify a traffic stop). No other vehicles were in the vicinity of the recreational vehicle at the time the vehicle briefly moved onto the shoulder. (filing no. 33 at 56:14–57:1)

While Trooper Covert testified at the evidentiary hearing before Magistrate Judge Thalken on May 3,2000 that the trooper was concerned that the driver of the recreational vehicle might be impaired (filing no. 33 at 39:7–40:3), the court finds that merely driving momentarily, and apparently inadvertently or inattentively, onto the shoulder is insufficient to provide an officer with probable cause to believe that the driver is impaired. *See United States v. Lyons*, 7 F.3d 973, 976 (10th Cir.1993) ("[I]f failure to follow a perfect vector down the·highway or keeping one's eyes on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy."). As the Nebraska Supreme Court observed in *Richardson & Gillispie v. State*, 200 Neb. 225, 263 N.W.2d 442 (1978), "it is a matter of common knowledge that careful drivers not only may on occasion, but frequently must, use the shoulders to some extent as a part of the highway . . . ." *Id.* at 446. In addition, the court notes that Trooper Covert did not express his concern that the driver of the recreational vehicle might be impaired until the hearing before Magistrate Judge Thalken on May 3, 2000 on the defendants' motions to suppress (filing nos. 17 and 21). The court finds it significant that Trooper Covert did not mention his concern about the defendants' impairment during the preliminary hearing on February 16,2000 in Dawson County District Court, and that he did not note such a concern in his written report of the incident.

Upon review of the language of Section 60–6,142, and the exceptions to the rule stated therein, the court finds and concludes that the Nebraska legislature did not intend to prohibit a driver from momentarily drifting over the shoulder line of an interstate highway on a single occasion. Rather, the Nebraska legislature enacted Section 60–6,142 to prohibit drivers from "driving" on the shoulder, that is, using the shoulder as a thoroughfare or a primary travel area. Construing Section 60–6,142 in this manner effectuates the purpose of the Nebraska Rules of the Road of making "more uniform highway traffic laws between states." Neb.Rev.Stat. § 60–602(1). Accordingly, the court concludes that the defendants did not violate Section 60–6,142 when their recreational vehicle momentarily drifted approximately one foot onto the south shoulder of Interstate 80 on a single occasion.

---

**6.** Although Trooper Covert testified during the May 3, 2000 hearing that the recreational vehicle traveled on the highway shoulder for a distance of 40–50 feet (filing no. 33 at 13:9–12), the court shall credit Trooper Covert's earlier testimony on February 16, 2000 during a preliminary hearing in Dawson County District Court that the recreational vehicle traveled on the highway shoulder for a distance of only 25–30 feet (filing no. 33 at 41:22–24).

Therefore, based on a de novo review of the record, the court concludes that the defendants' recreational vehicle was illegally stopped, and, therefore, any evidence derived from the traffic stop will be suppressed. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Accordingly, after carefully conducting a de novo review of the entire court record, the court finds and concludes that filing no. 34, the Report and Recommendation of Magistrate Judge Thalken is accurate, complete, and in accordance with applicable law. Consequently, the court finds and concludes that filing no. 34, the Report and Recommendation of Magistrate Judge Thalken, shall be, and hereby is, adopted in it entirety.

THEREFORE, IT IS ORDERED:

(1) That filing no. 35, the "Government's Objection to Magistrate's Report and Recommendation," filed by the plaintiff, the United States of America, is overruled;

(2) That upon de novo review, filing no. 34, the "Report and Recommendation" of Magistrate Judge Thomas D. Thalken, is adopted in its entirety;

(3) That filing no. 21, the "Motion to Suppress," filed by the defendant, Troy E. Martin, is granted; and

(4) That filing no. 17, the "Motion to Suppress," filed by the defendant, Daryl Graumann, is granted.

DATED this 20th day of May, 2010.

BY THE COURT:

THOMAS M. SHANAHAN

United States District Judge